UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLENE HENDERSON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF SANTA CRUZ, et al.,<br><br>    Defendants. | Case No. 14-cv-03544-RMW<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 22 |

James Henderson, a former inmate at the Santa Cruz County Jail Mental Health Unit, murdered his parents Joseph and Edyth Henderson sometime after he was released from jail. Marlene Henderson, James's sister and daughter of Joseph and Edyth, bought suit against various Santa Cruz County municipal agencies under 42 U.S.C. § 1983 and state law tort causes of action, alleging that defendants are responsible for the murders. Defendants County of Santa Cruz, The Santa Cruz County Sheriff's Department and the Santa Cruz County Health Services Agency (collectively, "County" or "defendants") move to dismiss the First Amended Complaint of plaintiffs Marlene Henderson, The Estate of Edyth Henderson and The Estate of Joseph Henderson (collectively, "plaintiffs") under Federal Rules of Civil Procedure §§ 12(b)(1) and 12(b)(6). For the reasons explained below the court DENIES the motion to dismiss.

# I. BACKGROUND

## A. Factual Background

As alleged in the First Amended Complaint (FAC), plaintiff Marlene Henderson is the surviving daughter of decedents Edyth and Joseph Henderson. Dkt. No. 19, FAC at 1. On June 30, 2013 Edyth and Joseph were both murdered by their son, James Henderson. *Id.* at 3. James was previously housed in the Santa Cruz County Jail Mental Health Unit. *Id.* Prior to his release from jail, Edyth and Marlene both asked for James to be released to a mental health facility, because James suffered from "paranoid schizophrenia, agoraphobia, and antisocial personality disorder." *Id.* Prior to his release, James made specific threats against Edyth, Joseph, and Marlene.

Both Edyth and Marlene were "assured" by the County that James would be released from jail into a mental health program, and both requested that the County notify them when James was released. *Id.* at 4.

The FAC does not actually allege that the County promised to notify the Hendersons of James's release, but implies that such a promise was made when it alleges that the Hendersons were harmed by County's policy "whereby civilians are given false assurances . . . that they would be notified prior to the release of inmates who have made specific threats of violence against them prior to the release of the inmates." *Id.* at 6. Construing the alleged facts in the light most favorable to the Hendersons, the court will treat the complaint as having alleged such a promise.[1]

James was released from jail one month early, was not placed at a mental health facility, and the Henderson family was not notified. Although not alleged, the County represents that James was released on February 11, 2013. Dkt. No. 7 at 3 n.1; *see also* Dkt. No. 27-1 (transcript of first motion to dismiss hearing) (plaintiffs' counsel: "The murder was in June. And he was released in, I believe, February"). On June 30, 2013 James killed his parents in their home. FAC at 4.

## B. Procedural Background

Plaintiffs filed a complaint alleging five causes of action in Santa Cruz County Superior

---

[1] This is also consistent with plaintiffs' counsel's arguments at the hearing on the motion to dismiss the FAC.

Court. Dkt. No. 1-1. Plaintiffs alleged (1) wrongful death, (2) negligent infliction of emotional distress, (3) negligent hiring, training, and supervision, (4) negligence, failure to warn, and (5) a 42 U.S.C. § 1983 *Monell* claim based on a 14th amendment due process right.

Defendants removed the case to federal court based on the § 1983 claim and then moved to dismiss. Dkt. No. 1 (Notice of Removal); Dkt. No. 7 (Motion to Dismiss). The court granted in part the motion to dismiss, dismissing the § 1983 *Monell* claim for failure to allege any policy or practice of the County. Dkt. No. 16. The court noted that if the § 1983 claim was dismissed, the case would likely be remanded to state court. *Id.* Plaintiffs then filed a FAC realleging the § 1983 claim, Dkt. No. 19, and defendants filed the instant motion to dismiss the FAC. Dkt. No. 22.

## II. ANALYSIS

### A. Requests for Judicial Notice

In addition to the motion to dismiss, defendants filed two requests for judicial notice. Dkt. Nos. 23 and 27. Under Federal Rule of Evidence 201(b)(2), the court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

The first request asks the court to take judicial notice of the California Law Revision Commission 1964 Annual Report. Dkt. No. 23-1. The second request asks the court to take judicial notice of a transcript from the first motion to dismiss hearing, Dkt. No. 27-1, and plaintiffs' Government Code § 910 claim against the County of Santa Cruz, Dkt. No. 27-2. The court takes judicial notice of the Annual Report and the transcript.[2]

As to the Government Claim, documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The Government Claim is alleged in the FAC, Dkt. No. 19 at 3, and no party questions the authenticity of the Government Claim. Accordingly, the court is not required to take

---

[2] The transcript includes plaintiffs' counsels' statement that James was released from prison in February 2013. Dkt. No. 27-1. The transcript does not establish that any plaintiff knew when James was released.

judicial notice of the Government Claim, but may consider it as part of the complaint.

### B. Section 1983 Claim Based on *Monell* Liability

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent School Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). To bring a § 1983 claim against a municipality under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the plaintiff must identify an official municipal policy or custom that caused the constitutional tort. The court addresses each requirement in turn.

#### 1. Acting Under Color Of State Law

County argues that the actor that caused plaintiffs' harm, James Henderson, was not a state actor and therefore the County cannot be liable for his actions. "As a general rule, members of the public have no constitutional right to sue state employees who fail to protect them against harm inflicted by third parties. . . . This general rule is modified by two exceptions: (1) the 'special relationship' exception; and (2) the 'danger creation' exception." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (citations omitted). Plaintiffs acknowledge that James was not a state actor, but argue that either the special relationship or danger creation exception applies.

##### a. Special Relationship

After the state has created a special relationship with a person, as in the case of custody or involuntary hospitalization, cases have imposed liability for harms to the person in custody under a due process theory, premised on an abuse of that special relationship. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 314-325 (1982) (patient in custodial facility for the mentally retarded denied protection from violence); *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976) (prisoner denied Eighth Amendment right to medical care).

Plaintiffs argue that the County had a special relationship with James to protect him "from rendering harm to himself and others" while in custody. Dkt. No. 25 at 7. That may be, but there is no dispute that neither James nor his parents were in custody or under control of the state at the time of the murders. The special relationship does not extend to actions taken by third parties against persons who do not have any custodial relationship to the state. *See DeShaney v.*

4

*Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200-01 (1989). Therefore, no special relationship exists.

Plaintiffs further suggest that the County could be liable for failing to properly treat James's mental health issues while he was in custody under a special relationship theory. Any special relationship related to James's treatment would be between the County and James, and not the County and the plaintiffs here.

### b. Danger Creation

"The 'danger creation' basis for a claim . . . necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Grubbs*, 974 F.2d at 121, citing *Wood v. Ostrander*, 879 F.2d 583, 588-90 (9th Cir. 1989) (plaintiff not in custody but state officer created the danger), cert. denied, 498 U.S. 938 (1990); *DeShaney*, 489 U.S. at 201 (plaintiff not in custody and state officer did not create the danger). The court discusses five cases applying the danger creation exemption and how those cases apply to the facts as alleged in the complaint.

In *DeShaney v. Winnebago* the Supreme Court held that the state had no duty to protect Joshua DeShaney from his father, even after the state had received and investigated reports of abuse. 489 U.S. at 201. When Joshua was four years old, his father beat him so badly that Joshua suffered permanent brain damage. *Id.* at 193. The Court first reasoned that no special relationship existed between the state and Joshua because Joshua was not in state custody or control at the time of the abuse. *Id.* at 200-01. The Court then reasoned that

> [w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all . . .

*Id.* at 201. Thus, there was no state-created danger, and no due process violation.

In *Wood v. Ostrander*, decided after *DeShaney*, the Ninth Circuit reversed the district court's grant of summary judgment against plaintiff. 879 F.2d at 586. Wood sued state trooper Ostrander under § 1983 after Ostrander pulled over the car Wood was riding in, arrested the driver, impounded the car, and then left Wood alone on the road at 2:30 a.m. in a known high-

5

crime area. Wood was later raped. *Id.* The court found a triable issue of fact "as to whether Ostrander's conduct affirmatively placed the plaintiff in a position of danger." *Id.* at 589-90 (internal quotation omitted).

In *L.W. v. Grubbs* the Ninth Circuit reversed the district court's order dismissing a § 1983 due process claim. 974 F.2d at 120. Plaintiff L.W. sued her state employers after an inmate at a mental health facility assaulted her where she worked. *Id.* The employers assigned the inmate, a violent sex offender, to work alone with L.W. despite knowing that the inmate was "very likely to commit a violent crime if placed alone with a female." *Id.* at 120. The Ninth Circuit recognized that no special relationship existed, but found that the danger creation exception applied, relying on *DeShaney* and *Wood*. *Id.* at 121. Specifically, the employers created the danger to L.W. by "us[ing] their authority as state correctional officers to create an opportunity for [the inmate] to assault L.W. that would not otherwise have existed. The Defendants also enhanced L.W.'s vulnerability to attack by misrepresenting to her the risks attending her work." *Id.*[3]

In *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), the Ninth Circuit affirmed the district court's order denying defendant's motion to dismiss on qualified immunity grounds. Police were called to Juan Penilla's home, and found him outside on his porch in need of emergency medical care. *Id.* at 708. The responding officers examined Penilla, cancelled the request for paramedics, moved Penilla inside his home, locked the door, and left. *Id.* Family members found Penilla dead the next day. *Id.* The court found that "[t]he officers in this case allegedly took affirmative actions that *significantly increased the risk* facing Penilla . . ." *Id.* at 710 (emphasis added). The court went on to note that "if affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983." *Id.*

Finally, in *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006), the Ninth Circuit

---

[3] After a remand and a verdict in L.W.'s favor, the Ninth Circuit held that "deliberate indifference" to a known danger was necessary for liability, and negligence or gross negligence would not suffice. *L.W. v. Grubbs*, 92 F.3d 894(9th Cir. 1996) (*Grubbs II*). Here, plaintiffs have pled deliberate indifference, FAC at ¶¶ 92-93, and defendants did not raise the issue in their motion to dismiss.

affirmed a district court's denial of defendant's summary judgment motion based on qualified immunity. Ms. Kennedy was shot, and her husband shot and killed, by their 13-year-old neighbor. *Id.* at 1057. Ms. Kennedy had contacted the Ridgefield police and accused the 13-year-old of molesting her 9-year-old daughter. *Id.* Ms. Kennedy asked the police not to contact the 13-year-old or his parents before warning the Kennedys because she feared for her family's safety. *Id.* at 1057-58. A Ridgefield police officer assured Ms. Kennedy that he would notify her before contacting the neighbors. *Id.* at 1058. The police officer nonetheless contacted the neighbors prior to alerting Ms. Kennedy, although only by about 15 minutes. *Id.* After being told that the neighbors knew about the molestation accusations, the Kennedys remained in their home overnight, "in part because [the police officer] allegedly promised to patrol the neighborhood." *Id.* That night, the 13-year-old broke into the Kennedy home and shot Mr. and Ms. Kennedy while they slept. *Id.* The court asked whether "any affirmative actions by [the officer] placed Kennedy in danger that she otherwise would not have faced." *Id.* at 1063. The court found that by alerting the neighbors before Ms. Kennedy, the officer "affirmatively created a danger to Kennedy she otherwise would not have faced, i.e., that [the neighbor] would be notified of the allegations before the Kennedys had the opportunity to protect themselves from his violent response to the news." *Id.* The court noted that the officer's assurance that he would patrol the neighborhood "was an additional and aggravating factor" and made the Kennedys more vulnerable, but the court did not rest its judgment on that misrepresentation. *Id.*

The County argues that this case is foreclosed by *DeShaney*, while plaintiffs argue that *Wood* and *Grubbs* allow this case to proceed at least past a motion to dismiss stage. The court agrees with plaintiffs, on one of plaintiffs' theories of liability.

First, plaintiffs argue that the County could be liable on a failure to protect theory: by not properly treating James's illness while in custody, or not releasing James into a mental health program, the County caused plaintiffs harm. This cannot be the basis for liability, as explained in *DeShaney*: "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual . . . If the Due Process Clause does not require

7

the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." 489 U.S. at 196-97 (citations omitted). Thus, the failure to provide treatment to James, even if that treatment that would have protected plaintiffs, cannot be the basis for liability.

Second, plaintiffs argue that the County is liable on a failure to warn theory, in that after affirmatively promising to notify plaintiffs of James's release and then failing to do so, the County placed plaintiffs at risk. Although the County is correct that a mere failure to warn of a danger is not a sufficient state act, as it is not affirmative conduct, here plaintiffs have alleged affirmative conduct on the part of the County when the County made a promise to warn the Hendersons and then released James into homelessness. *See Kennedy*, 439 F.3d at 1063 (the officer's "misrepresentation as to the risk the Kennedys faced was an additional and aggravating factor, making them more vulnerable to the danger he had already created"), citing *Grubbs*, 974 F.2d at 121 ("The Defendants also enhanced L.W.'s vulnerability to attack by misrepresenting to her the risks attending her work"); *Penilla*, 115 F.3d at 710 ("The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.").

Viewing the facts in the light most favorable to the plaintiffs, the complaint does allege that the Hendersons were exposed to a danger they would not have otherwise faced. FAC at 5 ("The conduct of [defendants] created a danger to the Plaintiffs and made them more susceptible to an existing danger then that they otherwise would not have faced."). Specifically, because the Hendersons were not warned that James was released, or that he was released into homelessness, they "did not call upon other law enforcement authorities or resources to ensure their safety upon James' release." Dkt. No. 25 at 7. Although the County argues that the Hendersons knew of James's violent threats, and knew that he would be released eventually, the Hendersons did not know James would be released into unsupervised homelessness and may have taken additional steps to protect themselves. Thus, had the County done nothing—made no representations to the Hendersons—they would have faced the danger of James being released and surprising them without any warning. Based on the actions of the County—assuring the Hendersons that they

8

would be notified of James's release—the Hendersons believed they faced a much a different risk, and did not prepare themselves for the risk they actually faced.[4]

This allegation distinguishes plaintiffs' case from *DeShaney*, where, according to the majority opinion, continually returning Joshua DeShaney to his father's home did not place him in any additional danger. 489 U.S. at 201 ("when [the state] returned [Joshua] to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all"). This allegation also aligns with *Kennedy*, where a failure to warn arguably placed plaintiffs in a more dangerous situation than the family previously faced. 439 F.3d at 1063 (explaining that the failure to warn deprived the Kennedys of "the opportunity to protect themselves.").

In sum, the plaintiffs have plausibly alleged that they were placed in a more dangerous position when the County promised to alert them to James's release and then failed to do so. It is the failure to warn that the County may be liable for, not for James's violent acts. A finder of fact will have to determine whether the County acted with deliberate indifference to a known risk that placed the Hendersons in a dangerous situation. Accordingly, at this stage that court concludes that the plaintiffs have alleged an action taken under color of state law.

**2. Deprivation of an Actual Constitutional Right**

The plaintiffs allege a violation their Fourteenth Amendment right to substantive due process by placing them in a known danger with deliberate indifference to their personal, physical safety, and a deprivation of the right to familial relations with regard to daughter Marlene. *Kennedy*, 439 F.3d at 1061; *Penilla*, 115 F.3d at 709. Such "conduct creates a constitutional claim." *Penilla*, 115 F.3d at 709, citing *Grubbs*, 974 F.2d 119, and *Wood*, 879 F.2d 583.

**3. *Monell* liability**

Because the § 1983 claim is made against the County, and not any individual actor, plaintiffs must allege a policy or custom that causes a violation of constitutional rights under *Monell v Department of Social Services*, 436 U.S. 658 (1978). Here, as relevant to the deprivation discussed above, the plaintiffs allege that the County has the following policies:

- A policy "whereby inmates with severe mental health problems and known

---

[4] The court discusses the causation issue *infra*.

propensities to commit harm to civilians are released from the Santa Cruz County Jail into homelessness where they pose an imminent threat of harm to civilians upon their release," FAC ¶ 88;
- A policy "whereby civilians who have been threatened by dangerous inmates housed at the Santa Cruz County Jail are not given notice prior to the release of dangerous inmates who pose a specific threat of danger and harm to civilians," FAC ¶ 89; and
- A policy "whereby civilians are given false assurances by the [defendants] that they would be notified prior to the release of inmates who have made specific threats of violence against them prior to the release of the inmates," FAC ¶ 90.

In combination, these policies would have caused the plaintiffs' alleged constitutional deprivation.

At this point in the proceedings, plaintiffs have not pleaded sufficient facts to support the existence of such policies, but that evidence is not necessary at the motion to dismiss stage. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167-68 (1993) (no heightened pleading standard for *Monell* claims); *see also Empress LLC v. City of San Francisco*, 419 F.3d 1052, 1055 (9th Cir. 2005) (same). Accordingly, the motion to dismiss is DENIED as to the § 1983 claim.

### C. State Law Claims

Plaintiffs also allege four state law tort claims against the County: (1) wrongful death, (2) negligent infliction of emotional distress, (3) negligent hiring, training, and supervision, and (4) negligence, failure to warn. The County argues that all four claims are barred by the County's statutory immunities. The County also argues that the failure to warn could not be the cause of the Hendersons' injuries because they knew James had been released.

#### 1. State Law Immunities

The County is immune from liability if its employee would be immune from liability. Cal. Gov't Code § 815.2(b). The County relies on various statutes that it argues establish the immunity of its employees, including California Government Code Sections 818.8, 820.2, 822.2, 845.8, 846, 855.6, 855.8, and 856.

As discussed above, plaintiffs have essentially alleged two theories: a failure to protect and a failure to warn. The plaintiffs' failure to protect theory is specifically immunized by Government Code §§ 845.8 and 846. Government Code § 845.8(a) immunizes a public entity from liability for "[a]ny injury resulting from determining whether to parole or release a prisoner or from

determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release." Government Code § 846 immunizes a public entity from liability for "injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody." Here, under a failure to protect theory, plaintiffs' injuries were allegedly caused by County's decisions as to the terms of James's releases and its decisions about his custody. Accordingly, the failure to protect theory is foreclosed by state law.

However, none of the sections cited immunizes the County from liability based on a failure to warn theory. *See Johnson v. State*, 69 Cal. 2d 782 (1968) (finding that Cal. Gov't Code §§818.8, 820.2, and 845.8 did not immunize Youth Authority's failure to warn foster parents of foster child's known violent tendencies); *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425 (1976) (liability under failure to warn theory).

**2. Causation**

The County argues that the failure to warn of James's release could not be the cause of plaintiffs' injuries because plaintiffs knew of the danger James posed. First, the threats that James made while incarcerated could not have placed the plaintiffs on notice that he would be released into homelessness without warning. James's threats posed an entirely different risk to plaintiffs while he was in custody. Second, while the County may be able, following some discovery, to show that the decedents knew of James's release before they were killed, at the pleading stage the facts in the complaint do not indisputably support such an inference.

It is a question of fact whether the failure to warn was a cause of the Hendersons' injuries. The FAC does not allege that plaintiffs had actual notice of James's release. County argues that the Hendersons' Government Claim shows that they knew James was released and not in custody. As discussed *supra*, the court considers the Government Claim as part of the complaint. *Marder,* 450 F.3d at 448. The plaintiffs' claim against the County of Santa Cruz includes the following statement:

> When Marlene Henderson learned that James Henderson had been released, she again notified the County of Santa Cruz Sherriff's Office and the Santa Cruz County Health Services Agency staff that James was a threat to their family. Marlene Henderson called the Sherriff's department on at least two separate occasions and asked if

> they could place James Henderson on a California Welfare and Institutions Code §5150 hold because he was threatening Edyth Henderson's and Joseph Henderson's safety. The County of Santa Cruz Sheriff's Office advised Marlene Henderson that there was nothing thing they could do unless James Henderson "committed a crime".

Dkt. No. 27-2 at 3. County thus argues that it is undisputed that the Hendersons knew James was released. The statement, however, does not conclusively establish that Edyth and Joseph, the decedents, knew that James was released into unsupervised homelessness. At the hearing on the motion to dismiss, plaintiffs' counsel represented that only Marlene, and not the parents, knew James was released. Accordingly, the failure to warn could be a cause of the Hendersons' injuries.

For the reasons explained above, the court DENIES the motion to dismiss the state law claims.[5]

## III. ORDER

For the reasons explained above, the court DENIES the motion to dismiss. Plaintiff is ordered to submit a Declaration pursuant to Code of Civil Procedure § 377.32(a) within 5 days of this order. The court sets a Case Management Conference for February 13, 2015 at 10:30 a.m.

Dated: January 16, 2015

_____
RONALD M. WHYTE
United States District Judge

---

[5] The court notes that plaintiffs have still failed to file a declaration as required by Code of Civil Procedure § 377.32(a), despite defendants raising the issue twice.

12